UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAY SCHMIDT,

    Plaintiff,

v.    Case No. 13-C-0174

CAROLYN W. COLVIN,

    Defendant.

## DECISION AND ORDER

This is an action for review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability insurance benefits under Title II of the Social Security Act. Plaintiff Jay Schmidt challenges the decision by the Administrative Law Judge (ALJ) denying him benefits because the ALJ failed to follow Social Security Administration (SSA) rulings and regulations. In particular, Schmidt argues that the ALJ erred by failing to give the proper weights to the opinions of Schmidt's treating physician and an examining consultative physician. For the reasons stated in this opinion, the Commissioner's decision will be affirmed.

## BACKGROUND

Schmidt filed an application for benefits on July 8, 2011, alleging he became disabled on May 31, 2009. (Tr. 180.) He amended his onset date to December 1, 2011, after the hearing before the ALJ. (Tr. 170.) The record reveals that Schmidt has a variety of health problems, including degenerative disc disease, diabetes, depression, anxiety, post-traumatic stress disorder, anger

management, and neuropathy. Some of these problems are of long-standing. For example, Schmidt was diagnosed with diabetes in 1995 (Tr. 443) and has struggled with anger management for most of his life. (Tr. 538–43.) He also has a history of head trauma, which he alleges has caused some of his mental health problems. Although Schmidt reports he was hit in the head some 400 times (Tr. 624, 687), the only two instances of head trauma evidenced in the record are in 2003 and 2010. In 2003, Schmidt was hit in the head with a baseball bat that required reconstructive surgery for multiple facial fractures. (Tr. 362–80.) Scans in October and December 2003 revealed no evidence of a skull fracture or intracranial hemorrhage. (Tr. 374, 380.) In August 2010, Schmidt received treatment at an emergency department for a three centimeter laceration to his head, but the treating physician noted no neurological problems. (Tr. 402–04, 473–75.) An MRI of his brain in 2011 was normal. (Tr. 729.)

As for his other complaints, Schmidt has generally received a conservative course of treatment. His treatment for his back problems consists of medication and physical therapy before and after his alleged onset date (Tr. 390–92, 405–08, 437–41, 443–44, 467–72, 476, 499–505, 554, 615–16, 621–28, 698–703, 709, 712) except for a cyst removal and possibly a lumbar laminectomy in 2000 to which his doctors occasionally refer. (Tr. 408, 428, 476, 627.) The actual medical records of these procedures are not in the administrative transcript. Even though physical therapy improved his symptoms, Schmidt failed to keep his appointments and was discharged from treatment on more than one occasion as a result. (Tr. 405–07, 439–41, 469–72, 499–501, 841–45.) Doctors also conservatively treated his shoulder problems and arm pain due to neuropathy with medication, though surgery was contemplated at some point. (Tr. 390–92, 409, 416–17, 427–30, 463–66, 477, 483, 489–92, 550–54, 621–24, 702–06, 712–14.) In connection with his back and

extremity problems, his various doctors have ordered imaging numerous times between 2009 and 2012. (Tr. 177–79, 417, 433, 505–510, 646–47, 729, 734, 754, 792, 855–56, 858–59.) The results of these tests have shown some degenerative changes, but even the most recent MRI of Schmidt's back in July 2012 indicates mild problems with small protrusions or tears and no significant changes from earlier tests. (Tr. 855–56.) His diabetes appears uncontrolled throughout his medical records for a variety of reasons, such as his failure to take the medications as prescribed, consistently monitor and record his blood sugar, and inability to maintain a healthy diet. (Tr. 382–84, 390–95, 410–11, 423–24, 431–32, 434–38, 443–44, 463–66, 478–79, 487–88, 493–98, 502–03, 550–54, 614, 630–34, 698–99, 704–06, 714, 806–13.) Treatment for his mental health problems—depression, anger management, and poor memory—consists mainly of intermittent counseling and medication. (Tr. 390–95, 423–24, 531–46, 567–69, 607–12.) A 2011 brain MRI was normal. (Tr. 729.) Schmidt's medical problems, particularly his diabetes, are exacerbated by his heavy smoking habit, as his doctors have repeatedly advised. (Tr. 391, 393, 410, 621.)

Of particular note for this appeal, are the reports by Dr. Gregory Thatcher, a treating physician, and Dr. Dennis Elmergreen, an examining consultative physician. Dr. Thatcher, Schmidt's most recent primary care physician, established care with Schmidt in May 2011. (Tr. 331.) He saw Schmidt eight times after establishing care until mid-2012 when records from his visits ends. (Tr. 550–51, 554, 618, 630–31, 633–34, 698–99, 704–06, 709.) Schmidt's complaints during this period varied but often included symptoms relevant here: back pain, shoulder pain, numbness, neuropathic pain, poor memory, and difficulty controlling his blood sugar. (*Id.*) Dr. Thatcher prescribed a variety of medications and referred him to an anesthesiologist, Dr. Paul T.

3

Hoell, to manage pain and a neurologist, Dr. David Kaufman, to assess his mental health complaints. (Tr. 554, 621–22, 624–28, 630–31, 698–99, 702–09, 729.)

Dr. Thatcher provided an opinion in the form of a five page questionnaire, dated February 20, 2012, opining that Schmidt suffered from diabetes, chronic back pain, depression, and cognitive impairment with a "fair" prognosis. (Tr. 331.) According to Dr. Thatcher, Schmidt's impairments would constantly interfere with his attention and concentration. (Tr. 332.) Schmidt could walk zero city blocks without rest or severe pain, sit for only ten minutes before needing to get up, and stand for only ten minutes at a time. (Tr. 332–33.) In an eight-hour working day, Dr. Thatcher opined that Schmidt could sit or stand/walk for less than two hours, must be able to shift positions at will, and must walk for two minutes every ten minutes. (Tr. 333.) Schmidt would also need to take multiple 30-minute breaks during the day. (*Id.*) Although he had an abnormal gate and positive straight leg test, Schmidt does not need an assistive device to ambulate. (Tr. 332–33.) Schmidt was also unable to twist, stoop, crouch, climb ladders, and climb stairs. (Tr. 334.) Dr. Thatcher identified significant manipulation restrictions: Schmidt could grasp, turn, or twist objects with his hands just five percent of an eight-hour day, manipulate objects with his fingers five percent of the day, and never reach with his arms. (*Id.*) Dr. Thatcher's opinion further stated that Schmidt could occasionally lift 10 pounds or less, but he could never lift 20 pounds or more. (*Id.*) Based on these impairments, Dr. Thatcher determined that Schmidt is likely to be absent from work more than four days per month. (*Id.*) Finally, Dr. Thatcher concluded that the description of symptoms and limitation in the questionnaire "existed before my first visit 5/2011." (*Id.*)

Dr. Dennis Elmergreen, a psychologist, examined Schmidt upon referral by the Department of Social Security Disability for a mental status and memory evaluation. He completed a disability

4

report dated March 10, 2012. (Tr. 659–63.) In addition to the exam, Dr. Elmergreen reviewed a psychological evaluation by Sandra King, Schmidt's memory testing indicating low average to extremely low memory functioning, and his medical records from Langlade Hospital General Clinic. (Tr. 660.) According to Dr. Elmergreen's report, Schmidt presented with poor grooming and hygiene, seemed "very upset emotionally," and disturbed by the mental status evaluation. (Tr. 661.) Schmidt informed Dr. Elmergreen that he was "not crazy" and felt "happy," though "his doctor told him he was depressed." (*Id.*) Schmidt reported that he had a quick temper, a negative view toward life, and had difficulty focusing. (*Id.*) Schmidt also complained of nightmares and intrusive visualizations related to the 2003 assault. (*Id.*) Dr. Elmergreen concluded that Schmidt was oriented to time, place, and person with generally organized thinking and good social skills, but he had difficulty focusing on mental tasks, his intellectual capacity was estimated to be below average, and his poor temper and emotional outbursts would likely affect his ability to maintain relationships. (*Id.*) Dr. Elmergreen administered the Wechsler Memory Scale-III Edition test that indicated extremely low to average range of memory, with his lowest scores in visual related subtests. (Tr. 662.) He concluded that Schmidt's ability to understand, remember, and carry out simple instructions was moderately impaired, ability to respond to supervisors and coworkers moderately to markedly impaired, ability to maintain concentration, attention, and pace moderately impaired, and ability to withstand routine work stressors and adapt to changes moderately to markedly impaired. (*Id.*)

Dr. Kyla King, a non-examining consulting psychologist, completed a review of the record and came to a different conclusion regarding Schmidt's mental capacity. (Tr. 664–81.) She concluded that Schmidt was not significantly limited in ability to understand and remember short

and simple instructions, moderately limited in his ability to interact with supervisors and coworkers, and moderately limited in his ability to respond to changes in the workplace. (Tr. 664–65.) Dr. King gave "partial consideration" to Dr. Elmergreen's assessment but concluded that Schmidt's "'severe' anger issues are not illustrated anywhere in file, other than what he reports." (Tr. 667.) In fact, an employer questionnaire indicated that his performance was satisfactory with no corrective actions or incidents. (Tr. 666.) Similarly, Dr. King determined that Schmidt's "sudden onset" of memory problems in June 2010 was not consistent with a head injury in 2003 absent other documented injuries or illness to his head before Dr. Elmergreen's assessment. (Tr. 667) Ultimately, Dr. King concluded that Schmidt has "the capacity to withstand the demands of unskilled work as defined by SSA." (Id.)

Dr. Mina Khorshidi, a non-examining consulting physician, also conducted a review of the record and concluded that Schmidt was capable of work at the light exertional level with certain limitations in her report dated March 27, 2012. (Tr. 689.) Her conclusions sharply differed from those given by Dr. Thatcher just one month earlier. According to Dr. Khorshidi, Schmidt could occasionally lift 20 pounds and frequently lift 10 pounds. (Tr. 683.) Schmidt was also capable of standing or walking for a total of six hours and sit for a total of six hours in an eight-hour workday with normal breaks. (*Id.*) She also concluded that Schmidt had no manipulative limitations despite his shoulder and hand problems aside from reducing his exertional level to light. (Tr. 685.) Dr. Khorshidi did agree that Schmidt had postural limitations in that he should only occasionally climb a ladder, stoop, crouch, or crawl because of his uncontrolled diabetes and back pain. (Tr. 684.) Her report also indicated that Schmidt was able to sustain employment after his injury in 2003 without special considerations and incidents. (Tr. 687.) Finally, Dr. Khorshidi found that Dr. Thatcher's

severe limitations were not supported because imaging revealed only mild degenerative disc disease, "slight anterior compression of T12," "tiny osteophytes between L4-5," well maintained disc space, and normal alignment and physical exams revealed no weakness, sensory, or reflex loss. (Tr. 683, 688.)

SSA denied Schmidt's initial application and on reconsideration. (Tr. 108–09.) After his application was denied upon reconsideration, Schmidt requested an administrative hearing. (Tr. 127–28.) A hearing was held before an ALJ on September 13, 2012. (Tr. 53.) Schmidt and a vocational expert testified at the hearing. (Tr. 53–107.)

The ALJ determined that Schmidt was not disabled. (Tr. 20–31.) He found that Schmidt met the insured status requirements and had not engaged in substantial gainful activity since December 1, 2011. (Tr. 22.) Also, the ALJ found Schmidt had eight severe impairments: mild degenerative disc disease, left upper extremity ulnar neuropathy, right shoulder impingement, diabetes mellitus, depressive disorder, personality disorder, post traumatic stress disorder, and mild neurocognitive disorder. (*Id.*)

At step three, the ALJ determined that Schmidt's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpt. P, App. 1. (Tr. 22–23) and determined Schmidt's residual functional capacity (RFC) as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR [§] 404.1567(c) except for the following restrictions. The claimant is limited to frequent climbing of ramps or stairs. He can only occasionally stoop, crouch, crawl, and climb ladders, ropes or scaffolds. Additionally he is limited to frequent bilateral reaching and only occasional bilateral overhead reaching. He also must avoid moderate use of moving machinery and exposure to unprotected heights. Further, he is limited to work in a low stress job, defined as having only occasional decision

7

making required and only occasional changes in the work setting. Finally, he is limited to only occasional interaction with co-workers and the general public.

(Tr. 24.) With this RFC, the ALJ found at step four that Schmidt was unable to perform past relevant work. (Tr. 29.) Finally, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 30.) These jobs included laundry operator, dishwasher, and industrial cleaner. (*Id.*)

Based on these findings, the ALJ concluded that Schmidt was not disabled within the meaning of the Social Security Act. (*Id.*) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Schmidt's request for review on November 26, 2012. (Tr. 1–5.) Schmidt then commenced this action for judicial review.

**STANDARD OF REVIEW**

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

8

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### I. Assessment of Treating Physician Opinions

Schmidt contends that the ALJ failed to give the proper weight to the opinion of his treating physician, Dr. Thatcher. He presents two arguments. First, Schmidt contends that the ALJ failed to provide "good reasons" for rejecting Dr. Thatcher's statements as required by SSA regulations. He argues that Dr. Thatcher's opinion was entitled to controlling weight because it was based upon objective findings and test results and was consistent with his treatment notes and other medical evidence of record. Second, even if the ALJ was correct that Dr. Thatcher's opinion is not entitled to controlling weight, the ALJ erred in assigning his opinion "little weight" because the ALJ failed to consider the factors set forth in 20 C.F.R. §§ 404.1527 and 414.927. According to Schmidt, if the ALJ had properly weighed Dr. Thatcher's opinion, the ALJ would have concluded that Schmidt was disabled.

9

An ALJ must give controlling weight to treating source opinions that are "well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 404.1527(c)(2); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). "Not inconsistent" carries a specific definition according to the SSA:

> This is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.

SSR 96-2p, 1996 WL 374188, *3 (July 2, 1996). More weight is given to the opinions of treating physicians because they have greater familiarity with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870. If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

"A finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2p, 1996 WL 374188, *4 (July 2, 1996). Non-controlling treating source medical opinions still "must be weighed using all of the factors" in 20 C.F.R. §§ 1527 and 416.927. *Id.* The required factors are "length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Campbell*, 627 F.3d at 308 (quoting *Larson*, 615 F.3d at 751); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Dr. Thatcher established care with Schmidt in May 2011. (Tr. 331.) As Schmidt's primary care physician, he saw Schmidt eight times after establishing care. (Tr. 550–51, 554, 618, 630–31, 633–34, 698–99, 704–06, 709.) As noted above, Schmidt presented with multiple complaints and received a variety of treatments over those eight visits. The treatment notes consistently reflect that Schmidt complained of back pain, pain in his extremities, depression, anger management issues, and difficulty controlling his diabetes. (Id.) He prescribed a variety of medications for Schmidt's symptoms, including Glucophage and insulin for his diabetes and Gabapentin for pain. (Tr. 554–55.) He also referred Schmidt to two specialists. (Tr. 554, 621–22, 624–28, 630–31, 698–99, 702–09, 729.)

On February 20, 2012, Dr. Thatcher completed a five page questionnaire opining that Schmidt suffered from diabetes, chronic back pain, depression, and cognitive impairment with a "fair" prognosis. (Tr. 331.) As detailed above, in Dr. Thatcher's opinion Schmidt's impairments would constantly interfere with his attention and concentration, he was unable to walk, sit, or stand for any significant length of time, he required multiple breaks throughout the day, was unable to manipulate objects with his hands for much of an eight-hour workday, and he could only occasionally lift 10 pounds or less. (Tr. 332–34.) Dr. Thatcher also noted that Schmidt's impairments would cause more than four absences per month. (Tr. 334.) And, importantly for this case, Dr. Thatcher stated that the description of symptoms and limitation in the questionnaire "existed before my first visit 5/2011." (*Id.*)

In this case, the ALJ gave "little weight" to the opinions of Dr. Thatcher because his conclusions were inconsistent with the record and there was no evidence to support the severity of the restrictions or his rapid decline. (Tr. 28.) That is, the ALJ found Dr. Thatcher's opinions were

11

both not well supported by "medically acceptable clinical and laboratory diagnostic techniques" and were inconsistent with other "substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *Punzio*, 630 F.3d at 710. .

Schmidt contends that the ALJ's opinion failed to abide by the SSA regulations regarding treating physician opinions. According to Schmidt, the ALJ rejected Dr. Thatcher's opinion for only two reasons: Dr. Thatcher did not explain what objective evidence had changed since Schmidt stopped working and no evidence supported the severity of the restrictions given Schmidt's work and daily activities. He elaborates on these two basic points by contending that the ALJ's findings are contrary to the record, are not sufficiently articulated to enable the court to trace the path of reasoning, are the result of the ALJ "playing doctor," and are otherwise not justified with good reasons. (Pl. Br. 29–35, ECF No. 14.)

Contrary to Schmidt's assertions, the ALJ gave several good reasons for the weight he assigned Dr. Thatcher's opinion and provided a clear logical bridge to allow the Court to trace his reasoning. Most significantly, the ALJ noted that Dr. Thatcher opined that Schmidt's symptoms and limitations pre-dated May 2011. (Tr. 28.) But prior to May 2011, Schmidt was working full time in a job that, according to Dr. Thatcher, should have been impossible for him. (*Id.*) As the ALJ explains at length, "the record reveals that the claimant's allegedly disabling impairments were present at approximately the same level of severity prior to the alleged onset date. He sustained an injury to his thoracic spine in October 2003, he was diagnosed with diabetes in about 1995, and he attributes his memory and anger due to his childhood or his October 2003 head trauma." (Tr. 25.) These conclusions are fully supported by the record. The ALJ went on to explain that "the record indicates that the claimant stopped working due to a business-related layoff rather than because of

the allegedly disabling impairments" in May 2009 and again in April 2011 (*Id.*) Schmidt himself acknowledged that he was laid off and not fired due to any of his disabilities. (Tr. 65, 305.) The ALJ then tied the significance of Schmidt's ability to work full-time with these same medical conditions in 2009 and 2011 to his current ability to work:

> This is significant because there is no evidence of a deterioration in the claimant's medical condition since that layoff that would cause limitations beyond those in the residual functional capacity. . . Objective testing of the claimant's lumbar spine has shown no significant deterioration since 2009; he continues to have only mild lumbar degenerative disease.

(Tr. 25–26.) The ALJ conducted a similarly detailed analysis of Schmidt's other health problems, noting the inconsistencies between the limitations described by Dr. Thatcher and Schmidt's work history, failure to follow doctors' orders, and objective testing. (Tr. 26–28.)

For example, the ALJ noted that Schmidt failed to pursue physical therapy for any length of time because he "failed to show up for his appointments." (Tr. 26.) In fact, the ALJ understated Schmidt's unwillingness to attend physical therapy or follow his at home exercise program. (Tr. 405–07, 439–41, 469–72, 499–501, 841–45.) The ALJ also highlighted Schmidt's failure to take his medication as prescribed and turned down more aggressive interventions. (Tr. 26.) The ALJ did inquire into the reasons for this limited treatment, as he must do. While Schmidt claimed that the lack of treatment was due to lack of insurance and money, the record suggests otherwise as Schmidt failed to show up for scheduled appointments. (Tr. 405–07, 439–41, 469–72, 499–501, 841–45.) The ALJ also considered that Schmidt also chose to continue spending money to fund his smoking habit which worsened his medical conditions (Tr. 391, 393, 410, 621), was contrary to the recommendations of several doctors (*Id.*), and strained his already precarious financial position. (Tr. 26.)

13

The ALJ also relied on the objective testing done in connection with Schmidt's back, shoulder, and cognitive problems in rejecting Dr. Thatcher's opinion. (Tr. 177–79, 417, 433, 505–510, 646–47, 729, 734, 754, 792, 855–56, 858–59.) The results of objective tests of his lumbar and thoracic spine do show some degenerative conditions but nothing that would support the severity of his symptoms or that his condition significantly worsened after Schmidt was laid off in 2011. (Tr. 26, 683.) For example, the most recent MRI of Schmidt's back in July 2012 indicated mild problems: "mild bilateral facet arthropathy and ligamentum flavum hypertrophy," "mild broad-based disc bulge with tiny to small superimposed central disc protrusion," "mild to moderate central canal stenosis," and "small central to right paracentral disc protrusion." (Tr. 855–56.) The results of this MRI ordered by Dr. Hoell notes "no significant interval change" and an "unchanged" mild chronic compression fracture at T12. (*Id.*) The 2012 MRI of his shoulder had similar results: "mild supraspinatus tendinosis with a very small partial-thickness tear of the very anterior margin of the supraspinatus tendon. No tendon retraction or muscle atrophy." (Tr. 858–59.) Further, a 2011 brain MRI was normal. (Tr. 729.)

The Commissioner's brief further identifies the extent of the conflicts between Dr. Thatcher's opinion and Schmidt's work history by citing the evidence in the record of some of the work activities in which Schmidt actually engaged. (Def. Br. 6–7, ECF No. 19.) In reply, Schmidt argues that the Commissioner's brief runs afoul of the Seventh Circuit's "*Chenery* doctrine" by citing evidence in the record not explicitly referenced in the ALJ's decision. (Pl. Reply 8–9, ECF No. 22.) He accuses the Commissioner of making findings regarding his specific work activities that were not made by the ALJ. But the Commissioner didn't make findings; she merely cited evidence, namely, Schmidt's own testimony and his work activity report, where he described his

14

work activity. Schmidt suggests that because the ALJ did not explicitly cite the same evidence in his decision, the Commissioner is barred from doing so under the *Chenery* doctrine.

This is a misreading of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943). *Chenery* holds, based on principles governing judicial review of administrative proceedings, an agency may not ask the court to uphold its action on a ground different from that on which the agency acted. 318 U.S. at 87–88, 92–93. It does not hold that the agency cannot cite evidence in the record that supports the actual findings that were made. Here, for example, the Commissioner is not asking the court to affirm the ALJ's decision on a ground not relied upon by the ALJ. Instead, the Commissioner has cited to evidence contained in the record that further supports the specific findings that the ALJ made. The ALJ found that Schmidt had actually engaged in work activity that was more strenuous than his own doctor claimed he was capable of performing at the time. (Tr. 28.) The Commissioner merely pointed the court to the evidentiary support for the ALJ's finding that exists in the administrative record. Given the fact that the central issue on judicial review of a decision of the Commissioner of Social Security is whether the Commissioner's factual findings are supported by substantial evidence, 42 U.S.C. § 405(g), this is entirely appropriate. To prohibit citation to any evidence in the record that was not expressly cited by the ALJ would reduce judicial review to a matter of cite checking the ALJ's decision. It would also confer an unfair advantage on the claimant. After all, the claimant in such cases cites to evidence not referenced by the ALJ that he thinks is contrary to the Commissioner's decision. What possible principle could justify barring the Commissioner from pointing to other evidence in the same record that supports the ALJ's finding? If there is one, Schmidt does not identify it.

While the ALJ's decision did not contain the level of detail found in the Commissioner's brief in comparing Schmidt's most recent employment with Dr. Thatcher's limitations, the ALJ is not held to the standard of articulation that Schmidt would demand. The ALJ's decision will be upheld if "substantial evidence" supports it and I am able to trace the ALJ's path of reasoning to conduct meaningful review. *Clifford*, 227 F.3d at 874. In this case, the ALJ provided ample explanation of the reasons for not affording Dr. Thatcher's opinion controlling weight. The ALJ found Schmidt's work history and treatment regimen to be inconsistent with Dr. Thatcher's opinion. He also concluded that the imaging of Schmidt's shoulder, back, and brain failed to support Schmidt's incapacities because they were unchanged after Schmidt's alleged onset date. The ALJ's expressed justifications for discounting Dr. Thatcher's opinion are "good reasons" to deny the treating physician's opinions controlling weight. *Larson*, 615 F.3d at 751. Because the ALJ provided "'an accurate and logical bridge' between the evidence and his conclusions," the ALJ's opinion will be upheld. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)).

As to Schmidt's second argument about the weight afforded to Dr. Thatcher's opinion, the ALJ is required to apply the SSA's regulations after determining that the opinion is not entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(2); *see also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."). Schmidt is correct that the ALJ did not individually articulate the factors in § 404.1527(d)(2). But there is no requirement that the ALJ

16

provide a separate analysis of each factor or provide a perfect opinion. *See* 20 C.F.R. § 404.1527(d)(2); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Here, the ALJ's lengthy explanation of the significant inconsistencies between Dr. Thatcher's opinion and Schmidt's actual work activities, as well as the results of the MRI's and X-rays, fully support the ALJ's decision to afford the opinion little weight. While the ALJ could have discussed Dr. Thatcher's specialty, the length, nature, and extent of the treatment relationship, and the frequency of examination, the record indicates that these factors would not alter the determination: Dr. Thatcher was not a specialist, he had treated Schmidt for less than a year when he provided the opinion, and he had seen Schmidt just five times. (Tr. 550–51, 554, 618, 630–31, 633–34).

## II. Assessment of Examining Consulting Physician Opinion

Schmidt next argues that the ALJ erred in failing to evaluate the medical opinion proved by Dr. Elmergreen, an examining consulting physician. Schmidt contends that the ALJ ignored the opinion and "failed to indicate any consideration of it." (Pl. Br. 40–41, ECF No. 14.) According to Schmidt, because the ALJ did not consider Dr. Elmergreen's opinion, there can be no meaningful judicial review and the case should be remanded.

To the extent that Schmidt contends that the ALJ completely ignored Dr. Elmergreen, he is mistaken and his argument is rejected. As the Commissioner notes, the ALJ did discuss Dr. Elmergreen's opinion in his decision, though he does not reference the doctor by his name. (Tr. 23,

17

27–29.) Most importantly, the ALJ assigned "some weight" to the opinion. (Tr. 29.) Thus, Schmidt's argument in his opening brief that the opinion was ignored is inaccurate.

In reply, Schmidt advances a slightly different argument. He argues that although the ALJ did make some references to Dr. Elmergreen's report, "[o]ther than saying that he gave it 'some weight' this court has no ability to determine what weight was given, how the ALJ arrived at his finding, what factors played into his decision and whether those findings were based upon substantial evidence." (Pl. Reply 15, ECF No. 22.) Schmidt also criticizes the ALJ's decision because "the decision does not actual [sic] provide any articulation of Dr. Elmergreen's opinion." (*Id.*) As a result, it appears that Schmidt has abandoned his argument that Dr. Elmergreen's opinion was not considered at all and now argues that the ALJ failed to provide an adequate explanation to allow meaningful judicial review. I disagree.

The argument that the case should be remanded because the court has no ability to determine what weight was given to Dr. Elmergreen's opinion extends a metaphor too far. In fact, opinions do not have weight; they consist of abstract ideas. We talk of the weight given an opinion as a way of describing how convincing it is. The kind of precision that measuring a body's weight allows is not possible when talking about the weight of an opinion. The ALJ adequately explained his reasons for discounting portions of Dr. Elmergreen's opinion. As explained above, the ALJ provided a detailed explanation of the significant inconsistencies between Schmidt's long-standing limitations, like his poor memory, and his ability to work despite these limitations for much of the past ten years. (Tr. 25–27, 29.) The ALJ gave only some weight to Dr. Elmergreen's opinion in 2012 because there is no decline in Schmidt's cognitive or mental abilities when it is compared to the earlier exam in 2010. (Tr. 29.) As the ALJ notes, Schmidt has "demonstrated his ability to sustain full-time work

18

despite any deficits." (*Id.*) While Schmidt claimed he had poor stress tolerance and coping skills, the ALJ concluded based on his work history and treatment that "he has volitional control over those symptoms to a degree that allows him to sustain full-time work." (Tr. 29.) The ALJ's conclusion is supported by substantial evidence in the form of Schmidt's own testimony at the hearing regarding his work history (Tr. 64–69), even with his cognitive limitations, as well as the essentially normal MRI of his brain in 2011. (Tr. 729.) Thus, the ALJ provided sufficient explanation of the weight he afforded Dr. Elmergreen's opinion and the reasons for this determination.

## CONCLUSION

Accordingly, and for the reasons set forth above, the Commissioner's decision is affirmed. The Clerk is directed to enter judgment in favor of the Commissioner forthwith.[*]

**SO ORDERED** this   7th   day of March, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

---

[*] Counsel for Schmidt is strongly advised to comply with the page limits set forth in the court's briefing order, or seek leave to be excused from those limits, in the future.